IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

STEVEN D. CREELMAN          :     CIVIL ACTION
                            :
        v.                  :
                            :
CARPENTERS PENSION & ANNUITY :
FUND OF PHILADELPHIA &       :
VICINITY                     :     NO. 12-718


MEMORANDUM

McLaughlin, J.                          May 14, 2013

        The plaintiff, Steven Creelman, initiated this lawsuit
after the defendant, Carpenters Pension and Annuity Fund of
Philadelphia and Vicinity ("Carpenters Fund" or "Fund"), denied
him a disability pension.  Creelman alleges that, in rendering
its decision, the Carpenters Fund violated several aspects of the
Employee Retirement Income Security Act of 1974 ("ERISA"), and he
brings suit under ERISA §§ 502(a)(1)(B), 29 U.S.C.
§ 1132(a)(1)(B), and 502(a)(3), 29 U.S.C. § 1132(a)(3).
Specifically, Creelman argues that the Fund unreasonably denied
him a disability pension, procedurally erred in the course of its
decisionmaking process, and breached its fiduciary duties.  He
contends that the Fund's unreasoned decision necessitates remand
so that it may reconsider its benefits determination, and that
its other violations estop it from pursuing certain eligibility
arguments before this Court and on remand.

        Creelman has moved for summary judgment on all claims.
The Fund has cross-moved for summary judgment on Creelman's

wrongful denial of benefits claim, which, if granted, moots Creelman's claims based on procedural error and breach of fiduciary duty.  The Court held oral argument on the parties' cross-motions, and will grant the Fund's motion for summary judgment on Creelman's wrongful denial claim and deny the motion for summary judgment filed by Creelman.

I.   Summary Judgment Record

The Court's review of the Fund's benefits determination is limited to the administrative record on which that decision was based.  Howley v. Mellon Fin. Corp., 625 F.3d 788, 793 (3d Cir. 2010); see also Fleisher v. Standard Ins. Co., 679 F.3d 116, 121 (3d Cir. 2012).  Creelman's breach of fiduciary duty claim, however, implicates some evidence extrinsic to the administrative record.  The Court, therefore, draws certain facts relating to that claim from admissible evidence in the summary judgment, but not administrative, record.  The facts described herein are undisputed unless otherwise noted.

A.   The Parties

The Carpenters Fund is a trust fund established under 29 U.S.C. § 186(c)(5) and constitutes an "employee benefit plan" within the meaning of ERISA, 29 U.S.C. § 1002(3).  The Fund operates as part of the Carpenters Pension and Annuity Plan of

Philadelphia and Vicinity ("Plan").  The Plan is governed by an
amended and restated plan document, the current version of which
has been in effect since May 1, 2010 ("Plan Document").[1]  The
Plan Document defines who qualifies as an "Active Participant" in
the Plan.  An individual becomes an Active Participant by working
a certain number of creditable hours per Plan Year, defined as
the twelve-month period beginning May 1 and ending April 30.  An
Active Participant loses that status by, among other things,
falling below a certain working-hour threshold in a Plan Year.
R. at D10303-04, D10306, D10310.[2]

Steven Creelman was born on December 8, 1960.  As of
October 2007, Creelman was employed by a company named AP
Construction Inc. to work in dock construction and was an Active
Participant in the Carpenters Fund.  R. at D00122, D00145

B.   <u>Creelman's Injury</u>

On October 29, 2007, while at his place of work,
Creelman tripped and fell onto his knees, fracturing his left
patella.  R. at D00002-03.  After suffering that injury, Creelman
remained out of work and collected workers' compensation for

---

[1] The parties agree that this May 1, 2010 amended and
restated version of the Plan Document is the operative version
for purposes of this suit.

[2] "R." refers to the administrative record.  "PX" refers to
any additional exhibits submitted in support of Creelman's motion
for summary judgment and "DX" refers to exhibits included along
with the Fund's summary judgment motion.

almost a full year, returning to his job in mid-October 2008. Creelman stopped working in December 2008, and, with the exception of another return to work for a period of time between May and July 2009, has been out of work and on workers' compensation ever since.  R. at D00146-53.

Between at least 2007 and 2009, Creelman received ongoing treatment from Dr. John Esterhai, M.D., and underwent several procedures related to his knee injury and other ailments. According to Dr. Esterhai, after Creelman's initial knee surgery, he began altering his gait as a means of favoring his left knee. As a result, Creelman developed pain in his right knee and heel, shoulders, hips, and lower back.  By the summer of 2008, Dr. Esterhai determined that Creelman had bulging discs in his lower back and a small tear of the medial meniscus in his right knee. R. at D00001-29.  In March 2009, Dr. Esterhai wrote a report, stating that he thought it was unreasonable, given the condition of both of Creelman's knees and his spine, to expect Creelman to return to heavy labor.  Dr. Esterhai stated that Creelman had "permission to return to sedentary work even now were such work available."  In Dr. Esterhai's estimation, however, based on Creelman's age, work history, and education, Creelman did not have the skills to perform "in that environment."  R. at D00030-31.

C.   <u>Creelman's Consideration of a Disability Pension</u>

At all times relevant to this action, the Carpenters Fund offered disability pensions to Active Participants in the Plan, subject to requirements established in § 2.07 of the Plan Document.  Section 2.07 provides, in relevant part, that an "Active Participant" shall become a "Disabled Participant," entitled to a disability pension, if he suffers a disability due to disease or bodily injury about which

> the Board [of Administration for the Fund ("Board")] makes a determination based on an examination of such Active Participant carried out by a doctor of medicine named by the Board and such other evidence as the Board may deem necessary, appropriate or desirable that such Active Participant is and presumably will continue to be for the remainder of his or her lifetime wholly prevented from engaging in any occupation or performing any work for wage or profit on account of such disability.

The section also states that a disability pension applicant must be an Active Participant in the Plan on the date of his application.  R. at D10312-13, § 2.07(a)(1)(B), (a)(4).

In May 2010, the Fund's manager, Joseph Obuchowicz, sent Creelman a letter advising him of how he might obtain a Carpenters' Disability Pension.  The letter specifically stated that Creelman's disability had to be severe enough to prevent him from doing any work for wage or profit for the remainder of his life and that Creelman was obligated to make an application while receiving the Fund's weekly disability benefit or workers' compensation supplement.  The letter further suggested that

-5-

Creelman simultaneously apply for a Social Security Disability Pension from the government.  Obuchowicz attached to his letter a copy of § 2.07, which outlined the full eligibility requirements for a disability pension.[3]  R. at D00034-35.

After receiving that letter, Creelman made an appointment to meet with Obuchowicz in early June 2010, with the intention of applying for a Carpenters' Disability Pension.  At the meeting, Obuchowicz informed Creelman that it would be prudent to wait to apply for a disability pension until November of that year.  According to Obuchowicz, Creelman would receive family medical benefits from the Plan's separate health and welfare fund until the end of October, but, if he applied for a disability pension, he would forfeit his eligibility for those benefits.  Based on Obuchowicz's representations, Creelman did not apply for a Carpenters' Disability Pension at that time. DX 1 (7/26/12 Creelman Dep.) at 29-31; PX 11 (10/9/12 Creelman Aff.) ¶ 5.

By the time of the June 2010 meeting, Obuchowicz was aware that, due to Creelman's lack of working hours, his status as an Active Participant would lapse on May 1, 2011.  Obuchowicz was also aware that Creelman would need to apply for a

_____

[3] It appears that Obuchowicz did not attach the most up-to-date version of § 2.07.  The version of § 2.07 appended to Obuchowicz's May 2010 letter and the version that appears in the May 1, 2010 Plan Document contain stylistic and minor wording differences that are not material to the eligibility requirements here at issue.  Compare R. at D00035, with R. at D10312-13.

Carpenters' Disability Pension by April 30, 2011, and that he was obligated to inform Creelman of this fact.  DX 2 (7/26/12 Obuchowicz Dep.) at 32-33.  At their meeting, Obuchowicz did not advise Creelman that he would lose his eligibility for a disability pension if he failed to file an application while still an Active Participant under the Plan Document or that his Active Participant status would lapse after April 30, 2011.[4] Following the meeting, neither Obuchowicz nor any other representative of the Carpenters Fund informed Creelman of the date by which he needed to submit a disability pension application.  PX 11 ¶ 6.

D.   Creelman's Application for Social Security Benefits

        In late 2010 or early 2011, Creelman submitted an application for Social Security disability insurance ("SSDI") benefits to the Social Security Administration ("SSA").  In connection with his application, Creelman was examined by Dr. Patrick Murphy, D.O., who submitted a report to the SSA in February 2011.  Dr. Murphy began his report by noting that Creelman had sustained a left patellar fracture in 2007.  He then went on to describe the various forms of treatment and diagnoses

_____

[4] Obuchowicz states that it would have been his obligation, at that meeting, to outline for Creelman the window during which he needed to apply for a disability pension.  Obuchowicz does not have any reason to believe that he failed to comply with his obligation on that date; however, he does not specifically recall informing Creelman of the need to file an application for a disability pension by April 30, 2011.  DX 2 at 25, 33.

provided by Dr. Esterhai in the interim.  In the course of his own medical examination, Dr. Murphy found that Creelman had, among other things, chronic pain in his left knee, mild degenerative joint disease in his right knee, bulging lumbar discs and back pain, bilateral hip strain, right heel plantar fasciitis, and a severed right big toe.  In Dr. Murphy's estimation, Creelman could stand or walk approximately one to two hours a day and was able to sit for eight hours per day.  Dr. Murphy did not opine on Creelman's capacity for work.  R. at D00090-107.

To be eligible for SSDI benefits, an applicant must demonstrate disability "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).  On April 1, 2011, the SSA issued Creelman an award of disability benefits, and found Creelman's date of disability to be December 7, 2010.  R. at D00082-85.

E.   Creelman's Initial Disability Pension Application

Following the SSA's award determination, Creelman applied for a Carpenters' Disability Pension in May 2011.  R. at D00058-60.  In response to Creelman's application, the Carpenters Fund sent him a letter on May 17, 2011, informing him that, in

order for his request to be processed, he was required to undergo an examination by a Fund-designated physician.  The letter stated that an examination had been scheduled with a "Dr. Mela."  The letter also reminded Creelman that, in order to receive a disability pension, his "disability must be Total and Permanent, and prevent [him] from engaging in any occupation or performing any work for wage or profit."  R. at D00066.

Dr. Anthony J. Mela, Sr., D.O., conducted a physical examination of Creelman on June 2, 2011.  Dr. Mela noted that Creelman had fractured his patella in a work-related injury on October 29, 2007 and had since undergone two knee surgeries, physical therapy for his left knee, and MRIs of his lumbar spine and right knee.  Dr. Mela confirmed many of the findings by Drs. Esterhai and Murphy.  His report stated that Creelman continued to suffer from tenderness and decreased mobility in both knees and from additional injuries, including pain in both hips, a "right median meniscus tear, multiple lumbar disc protrusions, and right heel and plantar fasciitis," due to altering his gait to compensate for his left knee injury.  Dr. Mela noted that Creelman had obtained medical treatment and advice from Dr. Esterhai regarding several of his ailments, and acknowledged that, in Dr. Esterhai's estimation, Creelman was "unable to return to the line of work that he was doing previously," namely, welding and power driving.  Dr. Mela ultimately concluded that

Creelman's physical impairments were not severe enough to preclude him from "engaging in any occupation or performing any work for wage or profit on . . . account of his disability for the remainder of his life."  Dr. Mela's opinion was that Creelman would require some vocational rehabilitation to perform other work, but that a return to work was possible.  R. at D00067-68.

On June 28, 2011, Obuchowicz sent Creelman a letter, informing him that his application for a Carpenters' Disability Pension had been denied on the basis of Dr. Mela's conclusion that Creelman was "not totally and permanently disabled for the remainder of [his] lifetime."  The letter stated that the decision was based on the eligibility requirements outlined in § 2.07 of the Plan Document.  Obuchowicz went on to inform Creelman of his right to appeal the initial denial to the Fund's Board.  R. at D00070-71.

F.   Creelman's Appeal

Creelman notified the Fund of his intention to file an appeal in a letter from his counsel, Stanley Gruber, on July 7, 2011.  R. at D00074-75.  On July 28, Gruber sent a second letter to the Carpenters Fund, articulating the bases for Creelman's appeal.  The letter stated that Creelman objected to the following aspects of the Fund's decision: (1) Dr. Mela's failure to provide any basis or support for his opinion that Creelman's

injuries did not forever prevent him from working in any occupation; (2) the failure of Dr. Mela and the Fund's Board to consider Creelman's age, education, training, and job skills when determining whether he was totally and permanently disabled; (3) the failure of Dr. Mela and the Board to consider the fact that Creelman had been awarded SSDI benefits, which are based on total disability; and (4) Dr. Mela's lack of experience or credentials in the field of orthopedic or physiatric medicine and the fact that he is a doctor of osteopathy, rather than a "doctor of medicine," who is required to conduct the examination contemplated in § 2.07 of the Plan Document.  Attached to the letter was the SSA's April 1, 2011 award of disability benefits and Dr. Murphy's medical report that had been submitted in conjunction with Creelman's application to the SSA.  R. at D00078-81.

Gruber thereafter sent Obuchowicz a letter on September 7, 2011, confirming that the Fund had scheduled Creelman for another medical examination with Dr. Larry Kramer, D.O., on September 12, 2011.  Gruber expressed his expectation that Dr. Kramer would be provided with a copy of Dr. Murphy's physician's report and a copy of Creelman's SSDI award.  R. at D00108-09.

Dr. Kramer examined Creelman on September 12, 2011, as scheduled.  The notes of examination reflect that Dr. Kramer

conducted a review of Creelman's medical history and a physical examination.  Dr. Kramer's assessment was that Creelman suffered from several physical ailments, including mild hypertension, swelling and pain in the left knee, probable hip osteoarthritis, and back pain.  On September 22, 2011, Dr. Kramer forwarded the notes of his examination to Obuchowicz.  Dr. Kramer's covering transmittal letter stated that he had "review[ed] copious amounts of records that [Creelman] was nice enough to supply."  He also provided his conclusion that Creelman's physical impairments were not severe enough to prevent him from doing any work for wage or profit for the remainder of his lifetime.  R. at D00113-17.  Obuchowicz forwarded Dr. Kramer's report to Gruber on September 27, 2011.  R. at D00112.

In an October 11, 2011 letter, Gruber again contested the sufficiency of the report and conclusions of the Fund-designated physician.  Gruber objected to (1) Dr. Kramer's failure to itemize what documents were included in the "copious amounts of records" he had reviewed and, in particular, whether he had reviewed Dr. Murphy's report to the SSA and the SSA's award of benefits; (2) the conclusory nature of Dr. Kramer's determination that Creelman was not totally and permanently disabled; (3) his failure to consider "vocational factors," such as Creelman's age, education, training, and job skills when

making this determination; and (4) the fact that Dr. Kramer was not an orthopedic surgeon or physiatrist.  R. at D00118-19.

On November 30, 2011, the Fund's Board of Administration met and voted to affirm the Fund's initial benefits determination denying Creelman a disability pension. The minutes of the meeting detail the chronology of Creelman's application, including the fact that Creelman was separately awarded SSDI benefits.  The minutes go on to state that Creelman "was evaluated by two panel physicians and was found not to be totally and permanently disabled by both.  Therefore, [he does] not meet the Plan's eligibility requirements for a disability pension . . . ."  The Board's Pension Appeals Committee recommended that the appeal be denied.  It then also noted that Creelman's Active Participant status had lapsed as of April 30, 2011, and that his application in May 2011 had been untimely.  R. at D00143-44.

Following the Board meeting, Obuchowicz conveyed to Gruber the Board's final decision denying Creelman's application for a disability pension.  He cited two bases for that decision. The first was the conclusion reached by Dr. Mela and Dr. Kramer that Creelman was not "totally and permanently disabled from all work."  The letter noted that the Plan Document was not required to track the SSA's definition of disability and in fact had "rejected that approach."  The second reason for the benefits

denial was the fact that Creelman had not been an Active
Participant when he applied for a Carpenters' Disability Pension
in May 2011.  This was the first time that the Fund referenced
Creelman's inactive status in its correspondence regarding his
pension application.  R. at D00123-24.

II.  <u>Analysis</u>[5]

Creelman acknowledges that the Fund's decision to deny
him a disability pension was based on two alternative and, in its
view, independently sufficient grounds: his lack of a total
disability and his inactive participant status.  <u>See</u> 12/19/12
Hr'g Tr. at 15-16.

In his present suit, Creelman challenges both bases of
decision.  He first contends that the Fund's disability
conclusion was unreasonable because the Fund failed to consider
vocational factors, such as his age, education, and job skill,
when assessing whether he was totally and permanently disabled;
the medical opinions on which the Fund based its decision were
substantively deficient; the Fund failed to consider his award of

---

[5] Summary judgment is appropriate if there "is no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving
party bears the initial burden of demonstrating the absence of
any genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>,
477 U.S. 317, 323 (1986).  Once a properly supported motion for
summary judgment is made, the burden of production shifts to the
non-moving party, who must set forth specific facts showing that
there is a genuine issue for trial.  <u>Anderson v. Liberty Lobby,
Inc.</u>, 477 U.S. 242, 249-50 (1986).

SSDI benefits; and procedural error undermines the rationality of the Fund's ultimate awards determination.

Creelman further argues that the Fund should be estopped, in these proceedings and on remand, if granted, from denying him disability benefits on the basis that his Active Participant status lapsed prior to submission of his pension application.  He claims that the Fund procedurally erred in failing to include his inactive status as a reason for its initial benefits denial, but then considering it as a reason for affirming that decision on appeal to the Board.  Moreover, according to Creelman, he failed to submit a timely application because Obuchowicz never mentioned that his Active Participant status would lapse as of May 1, 2011, an omission that constitutes a breach of Obuchowicz's fiduciary duties.  Creelman has moved for summary judgment on all claims.

The Fund counters that the Plan Document does not obligate it to undertake an individualized vocational analysis when making disability determinations and that its decision to deny Creelman a pension, based solely on his lack of a total and permanent disability, was reasonable.  It has cross-moved for summary judgment on Creelman's improper denial of benefits claim.

The Court concludes that the Fund's decision to deny Creelman a disability pension based on his lack of disability was not arbitrary and capricious, and that the Fund is entitled to

-15-

summary judgment on Creelman's wrongful denial claim.  In view of
that finding, the Court need not reach Creelman's estoppel
arguments.


     A.   <u>Standard of Review</u>

     The Plan Document vests the Board of the Fund with
exclusive, discretionary authority to determine eligibility for
Fund benefits and to interpret the Plan Document.  R. at D10353,
§ 5.01.  Accordingly, the Court applies the deferential
"arbitrary and capricious" standard of review to the Board's
denial of benefits.[6]  <u>Miller</u>, 632 F.3d at 844-45; <u>Abnathya v.
Hoffmann-La Roche, Inc.</u>, 2 F.3d 40, 44-45 (3d Cir. 1993)
(abrogated on other grounds).  The Board's decision will only be
declared invalid "if it is without reason, unsupported by
substantial evidence or erroneous as a matter of law."  <u>Fleisher</u>,
679 F.3d at 121 (quoting <u>Miller</u>, 632 F.3d at 845) (quotation
marks omitted); <u>Viera v. Life Ins. Co. of N. Am.</u>, 642 F.3d 407,
413 (3d Cir. 2011).

---

[6] The Supreme Court frames the judicial standard of review
relevant here as "abuse of discretion."  <u>Metro. Life Ins. Co. v.
Glenn</u>, 554 U.S. 105, 111, 115-16 (2008) (quotation marks and
citations omitted).  The Third Circuit has clarified that, in the
ERISA context, the "arbitrary and capricious" and "abuse of
discretion" formulations refer to an "essentially identical" mode
of analysis.  <u>Miller v. Am. Airlines, Inc.</u>, 632 F.3d 837, 845 n.2
(3d Cir. 2011).

B.   <u>Vocational Analysis Requirement</u>

        In determining that Creelman did not qualify as
disabled under the terms of the Plan, the Carpenters Fund did not
engage in an assessment of his particular vocational
circumstances.   The parties contest whether § 2.07 of the Plan
Document required the Fund to undertake such an analysis and
whether the Fund's decision violated this provision.   The Court
finds that the Fund acted reasonably in interpreting its Plan
Document to impose no such requirement.

        As the Fund notes, the definition of "disability" in
§ 2.07 of the Plan Document differs markedly from the definition
used in the context of the Social Security regime, which overtly
includes a vocational component.   To be eligible for SSDI
benefits, an applicant's disability must be "of such severity
that he is not only unable to do his previous work but cannot,
*considering his age, education, and work experience*, engage in
any other kind of substantial gainful work which exists in the
national economy."   42 U.S.C. § 423(d)(2)(A) (emphasis added).
Section 2.07 of the Plan Document, on the other hand, requires
that the applicant be "and presumably will continue to be for the
remainder of his or her lifetime wholly prevented from engaging
in any occupation or performing any work for wage or profit on
account of such disability."   R. at D10312.   As is readily
apparent, § 2.07 makes no allowances for the age, education, or

-17-

work experience of the applicant.  It is the disability—and not a combination of disability and these vocational circumstances—that must be the cause of the applicant's unemployment.  Thus, § 2.07 imposes a more stringent standard for "disability" than the Social Security regime and does not expressly incorporate any sort of vocational analysis.

Moreover, the existence of the applicant's total and permanent disability is a determination confided to the discretion of the Fund's Board.  That determination need only be based on "an examination . . . carried out by a doctor of medicine named by the Board and such other evidence as the Board may deem necessary, appropriate or desirable."  R. at D10312.

Notwithstanding the fact that the Plan's definition of "disability" does not explicitly depend on an applicant's job-related abilities or circumstances, Creelman points to two courts of appeals decisions from the Second and Tenth Circuits holding that, even under a "total disability" policy like the one at issue here, ERISA administrators must consider vocational factors when determining eligibility for disability benefits.[7]  The Court

_____

[7] Other cases cited by Creelman, including the Third Circuit's decision in Miller, are distinguishable from the present case, as they involve "own-occupation" policies, which measure disability against an applicant's capacity for performing the tasks of his own occupation, or policies that avowedly entail some vocational analysis.  See, e.g., Miller, 632 F.3d at 842, 855 (defining disability as the inability to continue working as an active pilot); Quinn v. Blue Cross & Blue Shield Ass'n, 161 F.3d 472, 474 (7th Cir. 1998), abrogated on other grounds by Hardt v. Reliance Standard Life Ins. Co., 130 S. Ct. 2149 (2010) (defining disability as the inability to perform a "comparable

-18-

of Appeals for the Third Circuit appears not to have weighed in on the proper construction of such general disability provisions. The Court is not persuaded that the reasoning of these cases requires it to countermand the Fund's interpretation of its Plan Document.

In Demirovic v. Building Service 32 B-J Pension Fund, the Second Circuit reviewed a plan provision that afforded a disability pension to participants who suffered from "[t]otal and permanent disability" 467 F.3d 208, 209 (2d Cir. 2006) (quotation marks omitted). Disability determinations were confided to the discretion of the plan trustees and required that the applicant "be unable to perform any gainful employment." Id. at 209-10. The Second Circuit found that the provision's seemingly stringent standard did not permit the defendant ERISA fund "to deny benefits to any claimant who is physically capable, in the abstract, of any kind of work whatsoever, regardless of the claimant's individual vocational circumstances." Id. at 213.

---

occupation" that provides similar salary to a person with "similar skills and education"); Lamanna v. Special Agents Mut. Benefits Ass'n, 546 F. Supp. 2d 261, 271-72 (W.D. Pa. 2008) (basing disability benefits on the inability to perform "each and every material duty pertaining to [one's] occupation" or, thereafter, the duties of any occupation for which one is "reasonably qualified by education, training or experience" (quotation marks omitted)).

Here, the policy is based on general disability, measuring an applicant's capacity for performing "any occupation." It is this latter formulation, or something akin to it, that is at issue in the Second and Tenth Circuit Courts of Appeals decisions cited by Creelman.

Instead, according to the court, the provision required the fund to consider factors, such as the applicant's physical capability, work skill set, and other available jobs.  See id. at 215.

The Second Circuit reached this conclusion by reasoning that an inability to perform "gainful employment" should not require the applicant to be utterly defenseless or abjectly incapacitated.  Instead, it required the claimant to be prevented from earning a "reasonably substantial income" or living wage. Id. at 214-15.  In the court's view, determining the claimant's ability for "gainful employment" necessarily included consideration of the claimant's particular vocational circumstances.  The court found that the fund's reliance solely on medical opinions was unreasonable under the policy, as "[a] determination of 'employability' cannot be purely a medical diagnosis."  Id. at 213.

Demirovic built on the reasoning of an earlier Tenth Circuit decision, Torix v. Ball Corp.  In Torix, the Tenth Circuit reviewed a disability provision almost identical to the one at issue in this case.  The provision in Torix stated that "[a] member shall be deemed to be totally and permanently disabled when, on the basis of qualified medical evidence, the Company finds such Members to be totally and presumably permanently prevented from engaging in any occupation or employment for wages or profit as a result of bodily injury or

disease."  862 F.2d 1428, 1429 n.1 (10th Cir. 1988) (emphasis omitted).  The Torix court held that a reasonable disability determination under that provision "must consider the claimant's ability to pursue gainful employment in light of all the circumstances." Id. at 1431.  Specifically, the plaintiff-claimant in Torix had objected to the ERISA fund's failure to consider his age, his educational background, and the availability of suitable geographically proximal employment when making its total disability determination.  Id. at 1429. Presumably, the Tenth Circuit viewed these as "circumstances" that the defendant fund was obligated, but failed, to consider.

In essence, Demirovic and Torix interpret phrases such as "unable to perform any gainful employment" and "prevented from engaging in any occupation or employment for wages or profit" to mean an inability to (i) engage in employment yielding a livable income (ii) based on one's unique vocational circumstances. Whether or not this is the best construction of these phrases, the Court is not persuaded that it is the only reasonable one, and reasonable is all that the Fund's interpretation of its Plan Document need be.  See R. at D10353, § 5.01 (granting the Fund's Board discretion to interpret the Plan's rules).  It may be that the Fund could not interpret its disability requirement so strictly as to withhold disability benefits from anyone who can "sell[] peanuts or pencils, which would yield only a pittance,"

as the Eleventh Circuit has opined.  See Helms v. Monsanto Co.,
728 F.2d 1416, 1421 (11th Cir. 1984).  Yet, it would seem
reasonable to deny disability benefits where the Fund is of the
view, based on medical opinion, that the applicant is physically
capable of some employment in the economy, without going into a
detailed and individualized analysis of the applicant's
educational and vocational circumstances.

Indeed, many plans explicitly define disability as an
inability to engage in employment for which the applicant is
"reasonably qualified by training, education, or experience."
See, e.g., Syed v. Hercules Inc., 214 F.3d 155, 157 (3d Cir.
2000); Lamanna, 546 F. Supp. 2d at 272.  The Ninth Circuit has
noted that a plan incorporating this kind of terminology
necessarily "requires some individuation in the analysis" of
benefits entitlement.  Pannebecker v. Liberty Life Assurance Co.
of Boston, 542 F.3d 1213, 1220 (9th Cir. 2008).  Such language is
not universal to all ERISA plans, however, and is absent from the
provision here.

That difference is material.  ERISA was intended to
offer employers "large leeway to design disability and other
welfare plans as they see fit," and entitlement to benefits under
any particular plan "is likely to turn, in large part, on the
interpretation of terms in the plan at issue."  Black & Decker
Disability Plan v. Nord, 538 U.S. 822, 833 (2003) (quotation

-22-

marks and citation omitted).  Moreover, as the Supreme Court
noted in Black & Decker, ERISA plans need not conform to either
the benefit structure or procedural requirements of the Social
Security program, which takes vocational abilities into account.
Id.; cf. Moats v. United Mine Workers of Am. Health & Ret. Funds,
981 F.2d 685, 689 (3d Cir. 1992) (noting that an ERISA plan is
not required to incorporate the standards of the workers'
compensation regime and that extra-plan standards should not bind
a plan's administrators).  Diversity among plans is entirely
permissible.

     Given the terms of the present Plan Document and the
flexibility ERISA is meant to afford plan administrators, the
Fund did not act arbitrarily and capriciously in determining that
the language of § 2.07 did not mandate individualized vocational
assessment of its disability pension applicants, including the
plaintiff in this case.


     C.   Review of the Record

     Having determined that a vocational analysis was not
necessary to the Fund's benefits determination, the Court next
addresses whether the various substantive and procedural
deficiencies alleged by Creelman render the Fund's decision
unreasonable.  In particular, Creelman contends that the Fund's
denial of a pension was arbitrary and capricious because the

physician reports on which it relied were insufficiently comprehensive and the examining physicians lack expertise in the field of orthopedic medicine or physical rehabilitation. Creelman also argues that the Fund failed to consider his SSDI award and committed procedural error.  The Court concludes that the Fund's decision to deny Creelman a disability pension was reasonable and supported by substantial evidence in the record.

      1.   Reports of Fund-Designated Physicians

Creelman lodges several attacks on the sufficiency of the examining physicians' reports and the Fund's reliance on those medical evaluations.

First, Creelman contends that the Fund's examining physicians, Drs. Mela and Kramer, did not support their ultimate findings with necessary factual evidence and offered only "bare conclusions."  Pl.'s Mot. Summ. J. at 46.  The Court disagrees. Dr. Mela provided in detail the results of his physical examination.  He noted Creelman's range of motion with respect to his lumbar spine, legs, and knees; he evaluated Creelman's ability to walk and bear weights; he reported the pain Creelman experienced in various body parts; and opined on the injuries causing Creelman pain.  Dr. Mela could have perhaps drawn a clearer line between the results of his examination and why Creelman would not be prevented from engaging in all occupations,

but it is evident from his opinion that he performed a reasonably thorough examination and concluded Creelman's pain and limited mobility would not preclude all forms of work, such as a sedentary desk job.

Dr. Kramer's report, following a physical assessment, also contains sufficient findings.  According to his report, Creelman suffered from mild hypertension; being overweight; swelling and pain in his left knee, which made walking difficult; probable osteoarthritis in his hip; and back pain.  Again, Dr. Kramer could have stated more explicitly why these medical problems would not preclude Creelman from working in any occupation, but his medical opinion is based on what appears to be a fairly comprehensive evaluation.  Moreover, the fact that two doctors reached this conclusion is further support that it was not an unreasonable or arbitrary one.  See Abnathya, 2 F.3d at 47.  Creelman's disagreement with the conclusions reached by these doctors is not a sufficient basis for declaring their findings unreasoned.

Next, Creelman argues that the Fund, on its own or acting through its examining physicians, did not adequately consider the multiple reports issued by Creelman's treating physician, Dr. Esterhai, or the report that Dr. Murphy submitted with Creelman's Social Security application.  "An administrator's failure to address all relevant diagnoses in terminating a

claimant's benefits is . . . a cause for concern that suggests the decision may have been arbitrary and capricious." Miller, 632 F.3d at 853.  Notably, an ERISA plan administrator may not "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." Black & Decker, 538 U.S. at 834.  It need not, however, accord deference to a treating physician's opinion, nor must it explain a decision to credit medical evidence that conflicts with the report of a treating physician. Id.; Stratton v. E.I. DuPont De Nemours & Co., 363 F.3d 250, 257-58 (3d Cir. 2004).

The Fund does not claim to have independently reviewed evidence from Drs. Esterhai and Murphy.  Instead, it argues that the doctors on whom it relied in making its disability decision gave proper consideration to Creelman's other physician reports.  Dr. Mela sufficiently considered the views of Dr. Esterhai.  Dr. Mela's report talks at length about the course of treatment provided Creelman by Dr. Esterhai ever since 2007.  Dr. Mela also took note in his "Assessment" section of Dr. Esterhai's recommendations that Creelman could not return to his previous line of work and that, if he did so, he would risk further damaging his knee.  In fact, Dr. Mela did not dispute this finding or any of Dr. Esterhai's other diagnoses.

Creelman does have a stronger argument with respect to the Fund's consideration of Dr. Murphy's report.  The only

evidence that either the Fund or its designated doctors reviewed Dr. Murphy's medical report is Dr. Kramer's reference to "reviewing copious amounts of records" supplied by Creelman.  R. at D00113.  It can be inferred that Creelman included in this collection of records his SSDI application, Dr. Murphy's report, and his SSA award, given that Creelman's counsel had earlier expressed the opinion that it would be important to furnish these documents to Dr. Kramer for his consideration.[8]  R. at D00108-09.  That being said, the administrative record does not definitively establish whether Dr. Kramer reviewed Dr. Murphy's report.

        Lastly, Creelman objects to the fact that Drs. Mela and Kramer are not specialists in orthopedic medicine or physical rehabilitation, which, as far as the Court can tell, is true.  The relative expertise of examining physicians is relevant to the Court's review.  See Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377, 393-94 (3d Cir. 2000) (abrogated on other grounds).

        This and the other foregoing arguments about perceived inadequacies in the reports of Drs. Mela and Kramer might be more persuasive were it not for the fact that Dr. Mela's and Dr. Kramer's conclusions comport with the findings made by Dr. Esterhai, who appears to be an orthopedic surgeon, as well as Dr. Murphy.  All four of these doctors made essentially the same

---

        [8] Creelman even asserts in his motion for summary judgment, though without citation to the evidentiary record, that he provided Dr. Kramer with a copy of his SSA award determination when Dr. Kramer examined him.  See Pl.'s Mot. Summ. J. at 15.

diagnoses.  All four determined that, following Creelman's fall, he continued to suffer from pain in both knees, his lower back, and hips.  Drs. Esterhai, Murphy, and Mela more specifically found that Creelman had developed disc protrusions in his lower back and right heel pain as a result of altering his gait to favor his injured left knee.  Both Dr. Esterhai and Dr. Mela determined that Creelman had suffered a tear in the meniscus of his right knee, which Dr. Murphy also noted in his report.  Dr. Esterhai, like the doctors recommended by the Fund, even concluded that Creelman's physical injuries did not prevent him from doing all work.  The difference is that Drs. Mela and Kramer, unlike Dr. Esterhai, did not find Creelman's vocational circumstances to act as a separate bar to obtaining employment.  Even there, however, the distinction between these opinions is not great.  For instance, Dr. Mela ultimately concluded that Creelman would require "vocational rehabilitation to perform other work;" he did not find that Creelman could immediately engage in new employment.  R. at D00068.

        In short, the Fund based its denial of a disability pension on medical opinion, as required by the Plan Document.  See R. at D10312, § 2.07(a)(1)(B).  In fact, § 2.07 permits the Fund to deny a disability pension on the basis of one medical examination.  The Fund did more than was required by conducting and relying on two physical examinations.  The medical opinions

offered by the Fund's doctors are consistent with the medical opinions offered by Creelman's own physicians, and there is no reason that the Fund-designated doctors' conclusions should be discounted.

### 2.   Consideration of SSA Award

An ERISA administrator need not defer to or always reconcile its own decision regarding an applicant's disability with a disability determination by the SSA.  Goletz v. Prudential Ins. Co. of Am., 383 F. App'x 193, 198 (3d Cir. 2010). Nevertheless, deviation from the SSA's determination or failure to consider a SSDI award is a factor to be considered in determining whether a denial of benefits was arbitrary and capricious.  Post v. Hartford Ins. Co., 501 F.3d 154, 167 (3d Cir. 2007) (abrogated on other grounds); see also Hobson v. Metro. Life Ins. Co., 574 F.3d 75, 91-92 (2d Cir. 2009).

As a preliminary matter, and as previously noted, there is some suggestion in the record that Dr. Kramer, the second Fund-designated physician to examine Creelman, reviewed Creelman's Social Security application, Dr. Murphy's accompanying report, and the SSA's award as part of the "copious amounts of records" provided him by Creelman.  R. at D00113.  In addition, the minutes from the Board meeting at which Creelman's appeal was

denied make specific mention of the fact that he had received SSDI benefits.  R. at D00144.

In any event, any failure to consider the SSA's award does not much aid Creelman's position that the Fund's denial of benefits was arbitrary.  As discussed above, the disability definition adopted in the Plan Document is more stringent than that utilized by the SSA and does not encompass a consideration of vocational factors.  In fact, the final determination letter that Obuchowicz sent Creelman informed him that the Plan did not need to apply Social Security disability criteria and that the Plan had rejected the SSA's approach to disability award determinations.  R. at D00123.  The SSA's finding of total disability, therefore, is of less persuasive value here than it would be in other plans that require an examination of the applicant's age, work experience, and education, and it was not unreasonable for the Fund to reach a contrary conclusion as to Creelman's disabled status or give little attention to Creelman's SSDI award.  See, e.g., Hoch v. Hartford Life & Accident Ins. Co., No. 08-4805, 2009 WL 1162823, at *16-17 (E.D. Pa. Apr. 29, 2009) (placing little determinative weight on the SSA's determination of the plaintiff's disability, in part, because the SSA had "very different guidelines for determining disability than does the Policy in this case").

-30-

Moreover, although the ultimate disability determination rendered by the SSA and the Fund differed, as previously explained, the medical opinions on which each was based were quite similar.  Even if the Fund gave the SSDI application materials short shrift, there is little danger that it rendered the Fund's decision arbitrary and capricious.

### 3.  Procedural Error

The Third Circuit has advised that "an administrator's compliance with § 503[ of ERISA, which outlines certain procedural requirements,] in making an adverse benefit determination is probative of whether the decision to deny benefits was arbitrary and capricious."[9]  Miller, 632 F.3d at 851.  In Miller, the court determined that a termination-of-benefits letter sent to the plaintiff was procedurally deficient. The Miller court found that the letter provided only cursory explanation of the fund's rationale for denying benefits and did not explain with precision the remedies available to the applicant.  Id. at 852-53.  The Third Circuit reasoned that, because the termination letter made it "exceedingly difficult" for the applicant to understand or challenge the denial of

---

[9] Miller also states that a court must consider underlying "structural concerns regarding how the particular ERISA plan was funded" as a relevant factor in determining whether the administrator's benefits decision was reasonable.  632 F.3d at 845.  Creelman does not argue that structural conflicts of interest undermine the rationality of the Fund's decision in this case.  Pl.'s Mot. Summ. J. at 29 n.22.

benefits due to its conclusory and vague language, there was even greater reason to find the denial lacking in reason.   Id.

Creelman does not claim that any of the Fund's letters were written in a manner that obfuscated the Fund's rationale or that Obuchowicz's denial letters lacked factual support.   Rather, he contends that the Fund's failure to mention his inactive status until its final determination exhibits that its decision was made in bad faith or arbitrarily.   Pl.'s Mot. Summ. J. at 34-35.   The Court finds this procedural deficiency minimally probative.   From the minutes of the Board's meeting, it appears that the Fund simply uncovered the fact that Creelman was no longer an Active Participant in the late stages of its investigation and cited it, in addition to its disability determination, as a separate reason for denying Creelman a disability pension.   Perhaps this demonstrates carelessness or a review lacking all desirable thoroughness, but it does not help establish arbitrariness or lack of reason.   Moreover, because the Board's denial was based on alternative and independently sufficient rationales, even putting aside Creelman's inactive status, the Board had a sound reason for its decision.

Viewing the record as a whole and weighing the various case-specific factors at issue, the Court finds that the Fund's decision to deny Creelman's application for a disability pension

was reasonable in light of the evidence with which it was presented.

      D.    <u>Attorneys' Fees</u>

        One final matter is Creelman's request for attorneys' fees.  ERISA permits a court, in its discretion, to award attorneys' fees and costs to either party, "as long as the fee claimant has achieved 'some degree of success on the merits.'" <u>Hardt</u>, 130 S. Ct. at 2152 (quoting <u>Ruckelshaus v. Sierra Club</u>, 463 U.S. 680, 694 (1983)) (interpreting 29 U.S.C. § 1132(g)(1)). Because the Court will uphold the Fund's benefits decision and grant summary judgment in its favor, the Court finds that Creelman has not achieved success on the merits of his claim and he is not entitled to an award of attorneys' fees.

## III. <u>Conclusion</u>

        For the foregoing reasons, the Court will grant the Fund's motion for summary judgment.  An appropriate order issues separately.